IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EBRAHIM SADEGHY, | No. C 06-02230 CRB |
| Plaintiff, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| ANTHONY KANE, | |
| Defendant. | |

In 1987, Petitioner Ebrahim Sadeghy was convicted in California state court of first-degree murder, the unauthorized practice of medicine creating risk to patient, and two counts of perjury. Sadeghy now petitions for a writ of habeas corpus, arguing that the California Board of Prison Terms' decision in 2005 denying him parole violated his due process rights. Because the Board's decision deeming Sadeghy unsuitable for parole was supported by "some evidence," the petition is DENIED.

### BACKGROUND[1]

The following facts are taken from the 1987 "Report of Probation Officer" and the opinion of the California Court of Appeal in In re Ebrahim Sadeghy, 2004 WL 1803312 (Cal.

---

[1] The last-reasoned decision by a state court – the decision of the Superior Court of California – made no "factual determinations" meriting deference under 28 U.S.C. § 2254(e)(1). Accordingly, the facts set forth in the "Background" section result from the Court's independent review of the record. See Weaver v. Thompson, 197 F.3d 359, 363-64 (9th Cir. 1999).

Ct. App. 2004), wherein the court denied Sadeghy's habeas corpus petition arising from the Board of Prison Terms' first denial of parole in 2002.

In 1984, Rodney and Myrtle Reid were a wealthy, childless, seriously-ill couple who were both in their eighties. Myrtle, who suffered from heart problems, underwent aortic valve replacement surgery and, under the influence of post-operative medication, fell and broke her hip. Three operations followed – to repair the hip, remove a blood clot, and repair heart deterioration that resulted from a high fever – but Myrtle was discharged in March of 1984 from the hospital.

Soon thereafter, Rodney – who had been in and out of hospitals with various ailments – was allowed to return home, mistakenly diagnosed with Alzheimer's disease for stroke-related problems. Myrtle was unable to care for either of them without help.

Myrtle hired help from a home services placement agency that, in October of 1984, sent Sadeghy to serve as caretaker. Under Sadeghy's care, Myrtle found that Rodney improved immeasurably. Myrtle bragged about Sadeghy's plans to become a doctor, and "loved him as the son she had never had." Troubling, however, was that Sadeghy held himself out as a licensed physician, having served in a residency program in Texas.[2] In fact, although Sadeghy had attended medical school in the Caribbean, he had never been licensed to practice medicine in the United States. In fact, Sadeghy had applied for a license in 1984 through the California State Medical Quality Assurance Board, but had failed the governing examination.

In December of 1984, Myrtle's lawyers filed a petition for Sadeghy's adoption on the Reid's behalf. However, the attorneys withdrew the petition two days later, doubting Rodney's mental competence. Rodney died eight days later. At the time of Rodney's death, Rodney's share of the Family Trust passed to the Alzheimer's Disease Foundation. Sadeghy tried to break the trust prior to Rodney's death, but Rodney was deemed incapable of

---

[2] Sadeghy even opened a joint checking account with Myrtle Reid wherein his name was listed as Ebrahim Sadeghy, M.D.

2

changing the trust. After Rodney's death, Myrtle filed an amended petition for the adoption, which was granted in January of 1985.

Next, Myrtle made Sadeghy her heir. Despite concerns voiced by her lawyers, Myrtle changed beneficiaries on her trust accounts, which would result in Sadeghy inheriting all of Myrtle's assets without restriction. In addition, Sadeghy convinced Myrtle that Rodney did not have Alzheimer's disease and that steps should be taken to break Rodney's portion of the trust. On June 11, 1985, a stock broker received a phone call to come to the Reid residence, and that afternoon a joint tenants agreement was signed by Myrtle and Sadeghy, purporting to give Sadeghy access to approximately $140,000 in stocks and bonds that were previously unavailable to him. Myrtle died that evening.

A neighbor of the Reids voiced her concern that Sadeghy was posing as a physician and had convinced Myrtle to stop taking necessary heart medication. A Board of Medical Quality Assurance Investigator conducted an investigation, which resulted in a letter from Myrtle Reid's physician attributing Myrtle's death to the withholding of her various medications. The investigation also resulted in a referral to the local District Attorney's office.

The DA's investigation discovered several witnesses who confirmed that Sadeghy purported to be a physician, frequently dressed in medical garb, and had "clearly encouraged" Myrtle to stop taking her medications. Criminal charges ensured.

In 1987, a jury convicted Sadeghy of first-degree murder, California Penal Code § 187, the unauthorized practice of medicine creating risk to patient, California Business & Professions Code § 2053, and two counts of perjury, California Penal Code § 118. Sadeghy was sentenced to a state prison term of 25 years to life on the murder conviction and concurrent mid-term sentences on the other counts.

Sadeghy received his first parole hearing in February of 2002, less than one year before his minimum eligible parole release date. The Board declined to set a parole date at that time, finding that Sadeghy "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board found Sadeghy unsuitable for

release principally because of "the timing and gravity of the commitment offense itself," which was particularly "insidious" and "cold-blooded." Sadeghy appealed the Board's decision, and subsequently filed a petition for writ of habeas corpus in the Santa Clara Superior Court. The trial court granted Sadeghy's petition, but that decision was reversed by the Court of Appeal, which concluded that "some evidence" supported the Board's finding that Sadeghy was unsuitable for parole. Specifically, the court found that Sadeghy's crime was carried out in a dispassionate and calculated manner. See In re Ebrahim Sadeghy, 2004 WL 1803312, *8 (Cal. Ct. App. 2004) (citing Cal. Admin. Code tit. 15, § 2402(c)(1)(C)).

The Board considered parole for Sadeghy again in May of 2005. And again the Board concluded that Sadeghy was unsuitable for release. The principal consideration for the Board was the nature of the commitment offense. The Board concluded that the apparent motive for Sadeghy's crime was financial gain, "which is certainly a trivial reason to end the life of a lady like this who apparently was only attempting to be kind and helpful," and that Sadeghy's offense was "certainly one that was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering." The Board was also influenced by Sadeghy's limited engagement in self-help programs in prison, and found that Sadeghy "needs to participate in self-help in order to understand and cope with stress in a nondestructive manner, but also in order to develop some insight into the commitment offense, as well as . . . other behavior that was noted regarding . . . misleading people that led up to this commitment offense."

Sadeghy sought relief through a habeas corpus petition filed in the Santa Clara County Superior Court, challenging the Board's denial of parole as an unconstitutional violation of his due process rights. In a one-page order, the court denied Sadeghy's petition, concluding that the Board's decision was supported by its reliance on "egregious acts beyond the minimum necessary to sustain [the] conviction." Sadeghy appealed, but was rebuffed in postcard denials by the California Court of Appeal and California Supreme Court. Sadeghy then filed a timely writ of habeas corpus in federal court, alleging that the Board of Prison

4

1 Terms violated his Fifth and Fourteenth Amendment rights by basing its denial on the nature
2 of the commitment offense and by making sham findings.

### STANDARD OF REVIEW

Section 2254 of Title 28 "is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction." White v. Lambert, 370 F.3d 1002, 1009-10 (9th Cir. 2004). Therefore, the Court reviews Sadeghy's habeas petition under the deferential standard of the Antiterrorism and Effective Death Penalty Act of 1996. The petition cannot be granted unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### DISCUSSION

Sadeghy's due process claim must be analyzed in two steps. "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989) (citation omitted).

It is now firmly established that California Penal Code § 3041 vests all California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause. Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir. 2007).

Sadeghy's petition therefore turns on whether the Board of Prison Terms unconstitutionally deprived Sadeghy of his due process rights. The Board's denial of parole cannot be contravened by this Court if its conclusion was "supported by some evidence in the record." Superintendent v. Hill, 472 U.S. 445, 454 (1974). To determine whether the some evidence standard is met "does not require examination of the entire record, independent

5

1  assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant
2  question is whether there is any evidence in the record that could support the conclusion
3  reached by the disciplinary board." Id. at 455-56.

4  When assessing whether the Board's suitability determination was supported by
5  "some evidence," the Court looks to the statutes and regulations that govern parole
6  determinations. See Irons, 505 F.3d at 851. Under California law, the Board must normally
7  set a parole release date before the prisoner has served his minimum term, but the Board may
8  deny parole if "in the judgment of the [Board,] the prisoner will pose an unreasonable risk of
9  danger to society if released from prison." In re Dannenberg, 34 Cal. 4th 1061, 1078, 1080
10 (2005). Circumstances tending to show that a prisoner is too dangerous to be found suitable
11 for parole include, inter alia, the nature of the commitment offense, a lengthy history of
12 severe mental problems related to the offense, and serious misconduct in prison. See Cal.
13 Admin Code tit. 15, § 2402(c).

14 Although the commitment offense may constitute a circumstance tending to show
15 unsuitability, the denial of parole can only be predicated on the underlying offense where the
16 Board can "point to factors beyond the minimum elements of the crime for which the inmate
17 was committed" that demonstrate the inmate will present a danger to society if released.
18 Dannenberg, 34 Cal. 4th at 1071. Factors beyond the minimum elements of the crime
19 include that "[t]he offense was carried out in a dispassionate and calculated manner," "[t]he
20 offense was carried out in a manner which demonstrates an exceptionally callous disregard
21 for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in
22 relation to the offense." Cal. Admin Code tit. 15, § 2402(c)(1)(B), (D), (E).

23 Among other things, the Board based its denial on the fact that Sadeghy's offense was
24 callous and motivated by a very trivial reason: financial gain. The Court is unable to
25 conclude that the Board's findings regarding the nature of the commitment offense were
26 without some evidentiary support. Sadeghy selected a particularly vulnerable victim,
27 weakened by age and medication. Through fabrication, Sadeghy ingratiated himself with the
28 Reids and garnered a position of trust, only to abuse that trust by persuading his victim to cut

6

short her own life. The Court agrees with the Board's conclusion that such facts demonstrate a callous disregard for human suffering.

Even more persuasive is the Board's conclusion that Sadeghy murdered Myrtle Reid for a trivial reason. Unlike the petitioner in Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008), Sadeghy took his victim's life without provocation. Indeed, Sadeghy's victim was nothing but kind and generous to him. Sadeghy's desire for financial enrichment was a trivial reason to take the life of Myrtle Reid.

The Court recognizes that the test "is not whether some evidence supports the reasons the [Board] cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." Hayward, 512 F.3d at 543 (quotation and citation omitted). But the test, as defined in Hayward, is satisfied in this case because there is evidence that, if released, Sadeghy might harm other victims. The Board considered the 2001 psychological assessment conducted by R.S. Coate that – although internally contradictory at parts – concluded it was likely that Sadeghy, motivated by greed, would continue his prior behavior of manipulation and deceit if released. The risk identified by Coate's prognosis was accentuated by Sadeghy's responses at the parole hearing, which demonstrated a troubling lack of insight into the nature of his crime and underlying pattern of dishonesty.

Sadeghy's argument that it was improper for the Board to rely on the commitment offense as a justification for denial because he has served his minimum sentence term is unavailing. To be sure, the Ninth Circuit places substantial weight on whether the petitioner has served the minimum sentence. Thus, in Irons, the court emphasized that "in all cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." 505 F.3d at 853. Although the Ninth Circuit has not imposed a bright line prohibition on relying on the commitment offense where the petitioner has served a minimum sentence, it is noteworthy that the court recently granted a habeas petition where denial of parole was

1 predicated on the commitment offense and the petitioner had served twenty-seven years on a
2 fifteen-year-to-life sentence.  See Hayward, 512 F.3d at 547.

3       The obvious problem for Sadeghy is that his minimum twenty-five year sentence will
4 not be served until 2010.  Thus, Sadeghy's case falls squarely within the rubric of Irons, not
5 Hayward.  Sadeghy attempts to evade Irons' reach by arguing that the Court should calculate
6 his minimum sentence in light of earned credits.  With credits included, Sadeghy became
7 available for release in 2002.  But the Ninth Circuit has routinely calculated the minimum
8 sentence by reference to the sentence imposed, rather than the sentence actually served, and
9 this Court finds no persuasive reason for doing otherwise.  See Hayward, 512 F.2d at 547;
10 Irons, 505 F.3d at 853; Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1125 (9th Cir.
11 2006); Biggs v. Terhune, 334 F.3d 910, 912 (9th Cir. 2003).

12       In short, the Board's conclusion that Sadeghy is unsuitable for parole is supported by
13 the fact that Sadeghy committed an atrocious crime for a trivial reason, and continues to
14 exhibit behavior suggesting that he has not confronted and remedied – or even attempted to
15 remedy – the underlying characteristics that led to the commission of the crime.
16 Accordingly, the petition for writ of habeas corpus is DENIED.

17       **IT IS SO ORDERED.**

20 Dated:  March 18, 2008                                CHARLES R. BREYER
                                                       UNITED STATES DISTRICT JUDGE